IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| GIL GARZA | § | |
| v. | § | CIVIL ACTION NO. 6:08cv130 |
| WARDEN BISCOE, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Gil Garza, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights during his confinement. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c). As Defendants, Garza sued Warden Chuck Biscoe, Warden Robert Herrera, Major Michael Owens, Sgt. Raymond Luna, and correctional officers Paula Guerrant and Shelby Jones.

An evidentiary hearing was conducted pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Garza says that in 1993, he was assigned to administrative segregation (known as "ad seg") because he was associated with the security threat group known as the Mexican Mafia. In 1994, he decided to disassociate himself from the gang, which placed him in serious risk and danger to his life. Beginning in 1996, he says, several assaults have been made on him by Mexican Mafia members.

In December of 2005, Garza says, he drafted an affidavit of ex-gang membership and sent it to the Security Threat Group director, Kenneth Lee; the Board of Pardons and Paroles in Austin; the Office of the Attorney General; the Executive Director of TDCJ, Brad Livingston; and the Governor of Texas. On December 14, 2005, he received a response from TDCJ-CID's Region

1

II Director, who said that Warden Biscoe would be notified of the correspondence to address Garza's life endangerment concerns.

Garza states that he is also an insulin-dependent diabetic, who must receive insulin injections twice a day. In order to receive these injections, he is escorted by security staff from his cell to the infirmary.

Garza says that between May of 2005 and May of 2007, the act of escorting him to the infirmary exposed him to a substantial risk of serious harm by general population inmates who occupied the hallways, because these inmates were simply made to stand and face the wall while he was going past them; the hallways were not cleared. Usually, he says, the inmates did not even face the wall, but simply "leaned on one shoulder" and watched the escort pass. Garza says that when security officers at the Beto Unit escort "ad seg" inmates anywhere in the prison, the hallways are supposed to be cleared, so as to remove any dangers to the inmate being escorted, who is handcuffed and thus vulnerable to assault. However, he contended that these procedures were generally not followed.

On May 1, 2007, at about 5:05 p.m., Garza says, he was handcuffed and removed from his cell by Officer Guerrant, and taken to the R-wing exit gate where they were met by Officer Jones. These officers took him to the infirmary for administration of his evening insulin shot. He was taken through the main hallways, in the general population housing area, to the clinic. They arrived at the infirmary at around 5:15 p.m., and Garza received his insulin shot and prepared for escort back to his cell.

At about 5:40 p.m., Garza says, he and the escorting officers entered a general population hallway, consisting of I, J, K, and L cellblocks, and went into a crash gate leading to M, N, O, and P cellblocks. A few seconds after they passed through the crash gate, another security officer unlocked P Wing and let about 20 to 25 inmates out into the main hallway. The escorting officers saw these inmates and observed that they all leaned against the wall, either on their own or in compliance with an order from a P Wing officer. In any event, Garza says, the escorting officers

2

did not order the hallway to be cleared of these inmates or order that the inmates go back onto P Wing before proceeding down the hallway. At the evidentiary hearing, Garza testified that the hallway had been cleared, but that the inmates from P Wing were then let out into the hall, where an officer held them up against the wall instead of returning them to the wing.

As they passed, Garza says that he noticed that many of the P Wing inmates were not facing the wall but were leaning on one shoulder staring at him. He turned around and saw two inmates, later identified as Javier Jaramillo and Daniel Delacruz, approaching with shanks (which Garza describes as "home-made ice picks") in their hands. Seconds later, Garza states that he was assaulted and stabbed repeatedly by the two inmates. One of the attackers snatched the riot baton away from Officer Jones. Garza says that both Guerrant and Jones failed to respond appropriately to the attack because they did not use their riot batons or their pepper spray, they did not order the assailants to lay on the ground, and did not order them to drop their weapons. He acknowledged at the hearing that he did not think that those inmates knew that he was going to be there, but that it was simply a coincidence.

Garza says that when he saw the inmate snatch Jones' riot baton away, he fled, fearing that the baton would be used to attack him further. However, he only made it about 20 feet before collapsing. One of the attackers followed and tried to continue the assault, and Garza fought back as best he could by kicking at the inmate while on his back. Lt. Nash then arrived at the scene and used pepper spray on the attacker, who was then restrained; the other inmate who had assaulted him was also restrained at this time.

Garza was taken to the infirmary, where he was told that he had received 16 stab wounds as well as contusions and bruising around his lower back area. A lieutenant named Facio came into the infirmary with the shanks that Garza had been stabbed with, and when Garza saw how long they were, he asked to be taken to a hospital to be checked for puncture wounds to vital organs.

A sergeant named Luna, whom Garza describes as a gang intelligence officer, came into the infirmary and said to Garza "you knew about this, you knew that they were going to get at

3

you." Garza told the sergeant about the affidavit he had prepared promulgating his ex-gang status and asked if his assailants were gang members, to which Luna replied "only one of them was suspected." Garza was taken to the hospital in Palestine, where he learned that one of his kidneys was partially punctured and that surgery may be required. The next day, he was sent to John Sealy Hospital in Galveston, and from there, he was transferred to the Estelle High Security Unit, his new unit of assignment.

Garza argues that Warden Biscoe was deliberately indifferent to his safety by operating the Beto Unit with insufficient staff and not properly training the officers who worked there. Similarly, he says that Warden Herrera failed to provide proper training to the ad seg officers and that Major Owens, the ad seg major, failed to train the officers and allowed officers with inadequate training to escort him.

Next, Garza says that Sgt. Luna failed to "segregate and investigate suspected Security Threat Group prisoners from general population and to segregate Security Threat Group prisoners from general population resulted in the assault and battery on Plaintiff May 1, 2007." He says that the failure by Officer Guerrant and Officer Jones to make sure that the hallway remained clear while escorting him to and from the infirmary, as well as their failure to protect him during the assault and their failure to order the inmates to return to P Wing exposed him to a dangerous situation and amounted to deliberate indifference to his safety, and also are torts under Texas state law. For relief, Garza seeks damages as well as a declaratory judgment that the actions complained of violated his rights.

The TDCJ Records

The Court has received and reviewed records concerning this incident. These records confirm Garza's statement as to what happened on May 1, 2007. As Garza says, the summary of the investigation by the Office of the Inspector General shows that on that date, inmates named Jaramillo and Delacruz assaulted Garza with homemade weapons in the main hallway of the Beto Unit. Garza received 16 stab wounds and was taken to the hospital in Galveston.

The case narrative says that Guerrant and Jones tried to push the attackers away, but the inmates pushed them down and struck them in the chest area. Jones lost control of her riot baton and Delacruz picked it up and hit her in the leg with it. Lt. Nash came to the area and attempted to intervene, but was punched in the face several times by Jaramillo. Delacruz tried to break a dayroom window to throw out his weapon, but Officer Foster secured him on the floor before he was able to do so. Officer Randolph retrieved the weapon from the floor. When the other officers arrived, Jaramillo laid down on the floor and did not offer any further resistance.

Guerrant gave a statement saying that she remembered Delacruz and Jaramillo facing the wall, but they turned their heads and stared at Garza. She said that they ran over and began assaulting Garza, but that she did not realize that they were stabbing him until later. It happened so fast that she did not have time to use her canister of pepper spray. She said that she tried to stop the attack by getting in between Jaramillo and Garza, but Jaramillo punched her in the chest, knocking her down. She got back up and tried to grab his arm, but Jaramillo knocked her down again. She dropped her riot baton but picked it up and hit Jaramillo in the back of the head with it. Nash used chemical agents, but Jaramillo struck him in the face. Other officers arrived and gained control of the situation. After the incident was over, Guerrant said, she saw the weapons on the ground.

Jones gave a statement saying that she and Guerrant were escorting Garza back to his cell when he was assaulted by Delacruz and Jaramillo. She hit Delacruz on the arm with her riot baton but she got knocked to the ground and lost it. Delacruz picked up the riot baton and hit her in the leg with it. Officer Foster came to the scene and subdued Delacruz.

The investigation concluded that at the time of the assault, the inmates were listed as "suspected" members of the Mexican Mafia, although they were listed as "confirmed" members at the time that the report was prepared. It noted that Garza had been a confirmed member but had wanted to disassociate from the gang, which was the reason for the assault.

Garza gave a written statement on May 2, 2007. This statement reads as follows:

> On May 1, 2007, at approximately 5:45 p.m., at the George Beto Unit, I was being escorted from the infirmary back to my housing assignment in administrative

5

> segregation, by officers Guerrant and Jones. At such time, I was passing through M-N-O-P cellblock as some inmates were lined up facing the walls, when unexpectedly I was attacked by two inmates with shanks and stabbed multiple times. I ran for safety and 1 of the 2 inmates ran after me and proceeded to attack me as I fell to the floor and I kicked him in the chest area as the officers finally controlled the situation. One of the two inmates that attacked me, who was wearing glasses, about 5'7" and 160 lbs, was a recent administrative segregation inmate and associated with the members of the Mexican Mafia and was a suspected soldier. Assuredly, the other inmate who attacked me, is a suspected Mexican Mafia member as well.

The TDCJ records received at the <u>Spears</u> hearing essentially confirm Garza's testimony as to what happened to him on May 1, 2007.

### The Plaintiff's Exhibits

Garza also attaches a number of exhibits to his complaint. The first of these is his affidavit of disassociation from the Mexican Mafia, dated December 6, 2005. The second is the letter from Stephens telling him that the correspondence had been forwarded to Warden Biscoe.

The third exhibit is a typewritten copy of a page from the TDCJ Administrative Segregation Manual, saying in pertinent part that inmates in administrative segregation "shall be escorted and restrained in accordance with provisions established in Post Order (P.O.-07.006), Segregation Offender." The next two exhibits concern Garza's attempt to get a copy of this post order, which was unsuccessful.

Exhibit F to Garza's complaint is an article in a publication called Prison Legal News, dated August of 2007, written by a Texas prisoner named Matthew Clarke, saying that the Texas prison system is significantly understaffed. Exhibit G is a series of diagrams, apparently drawn by Garza, of the area where the assault occurred, and exhibit H is a diagram of how he was being escorted by the officers, showing himself in handcuffs, Guerrant next to him holding his arm, and Jones in front.

Exhibit I is a request for medical information, and a copy of a sheet from Garza's medical records in answer to this request. Exhibit J is an inmate request form asking about his property, with the reply that he had received his property back on June 5, 2007. Exhibits K, L, and M are grievances which Garza filed.

The next exhibit is numbered as Exhibit A-1, and is a letter from Garza to the Office of the Inspector General, seeking information under the Texas Open Records Act. Exhibit B-1 is a form letter from the Office of the Inspector General saying "the case was true billed. For legal assistance, please contact State Counsel for Offenders." Exhibit C-1 is a letter to hospital officials in Galveston, asking for records, and a response saying that "we encourage you to use the process on your unit to discuss your health related concerns."

Exhibit D-1 is a letter to Sgt. Luna asking for information about his assailants. Exhibit E-1 is an inmate request form asking for the address of the hospital in Palestine, and a response saying that the law library did not have addresses for hospitals. Exhibit F-1 is a letter to the hospital in Palestine asking for records of his stay there.

The next exhibit is designated as Exhibit N, and is a memo from the law librarian stating that inmates without direct access to the law library could only receive copies of cases, not the actual book. Exhibit O is a letter to the American Civil Liberties Union seeking representation. Exhibit P is a response saying that the ACLU has suspended individualized responses to inmate complaints due to limited staffing. Exhibit Q is an inmate request to the law library for the names and addresses of attorneys in Walker County. Exhibit R is a response providing the names of two attorneys in Huntsville.

Exhibit S is a letter which Garza wrote to one of these attorneys, seeking representation. Exhibit T is a list of three attorneys in Houston. Exhibit U is a letter which Garza wrote to one of these attorneys, seeking representation.

Exhibit V is a letter which Garza wrote to the Office of the Inspector General (addressed to "Internal Affairs," the former name of that Office) seeking documents pertaining to the assault. Exhibit W is a response from the Beto Unit Open Records Coordinator, saying that Garza did not have sufficient money to cover the cost of copies and that the requests are not available to him under the policy governing open records requests. Exhibit X is another response, from John Moriarty of the Office of the Inspector General, saying that the Inspector General is not required to

comply with Garza's request because the Texas Open Records Act excludes requests from incarcerated individuals. Exhibit Y is a letter from Garza to Moriarty saying that the exclusion in the Act does not apply to him because he is seeking records pertaining to himself. Exhibit Z is a response to this letter, which is a duplicate of the response he received in Exhibit X.

## Legal Standards and Analysis

Garza's claims are that the prison officials were deliberately indifferent to his safety and that the supervisory officials failed to adequately train or supervise their subordinates. Prison officials have a duty not to be deliberately indifferent to the safety of their inmates. Johnston v. Lucas, 786 F.2d 1254, 1260 (5th Cir. 1986); Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986). A showing of mere negligent indifference is not enough for a constitutional claim. Davidson v. Cannon, 474 U.S. 344 (1986).

In Davidson, the Supreme Court faced the issue of what constitutes deliberate indifference to an inmate's safety. There, an inmate named Davidson was threatened by another inmate, McMillian. Davidson sent a note to the Assistant Superintendent of the prison, Cannon. Cannon passed the note to a guard named James. James, however, left the note on his desk and later forgot about it. McMillian later assaulted Davidson, causing serious injuries.

The Supreme Court acknowledged that the Defendants' lack of due care resulted in serious injury, but held that the lack of due care alone did not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent. The Court emphasized that negligence alone was insufficient to trigger the protections of the Fourteenth Amendment. Davidson, 474 U.S. at 347-48.

More recently, the Supreme Court has again addressed the issue of deliberate indifference to an inmate's safety in prison. The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...

> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); *see* Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

These standards likewise apply in the specific circumstance of inmate assaults. The Fifth Circuit has held that prison officials have a duty to protect inmates from violence at the hands of other prisoners; however, not every injury suffered by a prisoner at the hands of another rises to the level of a constitutional violation. Horton v. Cockrell, 70 F.3d 397, 400 (5th Cir. 1995). The plaintiff prisoner must prove both that he is incarcerated under conditions "posing a substantial risk of serious harm" and that the prison official's state of mind is one of "deliberate indifference" to the inmate's health or safety. Horton, 70 F.3d at 401, *citing* Farmer, 114 S.Ct. at 1977.

There is no concise definition of what types of prison conditions pose a "substantial risk of serious harm" under the Eighth Amendment. Instead, the Fifth Circuit said, this component of the test must be examined conceptually, making sure to be responsive to "contemporary standards of decency." The Court must consider "whether society considers the risk...to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Horton, 70 F.3d at 401, *citing* Helling v. McKinney, 113 S.Ct. 2475 (1993). Prison authorities must protect not only against current threats, but also must guard against "sufficiently imminent dangers" that are likely to cause harm "in the next week or month or year." Horton, 70 F.3d at 401.

In Horton, the plaintiff arrived at the Clements Unit and was immediately approached by an inmate named Jackson, who threatened to assault him unless he paid extortion money. Horton reported the threat the next morning to a desk officer, who said that he could not do anything and referred Horton to his correctional counselor. Later that same day, Jackson approached Horton and made threatening gestures; Horton, believing that he had no choice, punched Jackson in self-defense. Both Horton and Jackson were placed in pre-hearing detention.

9

Horton filed a grievance the next day stating that Jackson was assaultive and had tried to extort money from him. The warden refused Horton any relief and referred him to his correctional counselor. Horton appealed, saying that he had already talked to his counselor, but the appeal was denied.

Horton and Jackson were sent to the same section of the prison when they were released from detention. Horton continued to file grievances concerning Jackson's violent tendencies. Several days later, Jackson approached Horton and punched him in the eye. Horton and Jackson were again charged with fighting, and the disciplinary committee would not consider Horton's plea of self-defense. Based upon these facts, Horton had stated an arguably valid claim of failure to protect, because he had alleged both a sufficiently imminent danger and a substantial risk of serious harm.

In the present case, Garza says that he was known to be an ex-gang member, but concedes that his assailants were, at that time, only suspected of association with the Mexican Mafia; this had not yet been confirmed. Instead, he says that the halls should have been cleared, according to policy, but that they were not, and that the guards simply let the prisoners remain on the wall until he had passed. Had the hallway been cleared, Garza says, he would not have been assaulted.

Garza offers nothing to show that it was official prison policy to clear the hallway completely of inmates while a segregated prisoner is being escorted through, and none of the investigative reports make any mention of such a policy. At the evidentiary hearing, Warden Baker, a TDCJ warden, testified that when escorting inmates, the guards did not have to clear the halls but could make the prisoners in the hallway stand at the wall. Even assuming that Garza is correct and that such a policy existed, however, the fact that the guards failed to comply with this policy does not itself show that a constitutional violation took place. The Fifth Circuit has held that a violation of prison rules alone is not sufficient to rise to the standards of a constitutional claim. Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996); Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986).

Garza has not shown that the prison officials knew of and disregarded an excessive risk to his health or safety. The fact that he was escorted through the hall in handcuffs, while other prisoners were standing at the wall, is not itself enough to show that the officers knew that an "excessive risk" to his health or safety existed, or that they disregarded this risk. The prisoners in the hall had been ordered to stand facing the wall, and Garza was escorted by two security officers carrying riot batons and pepper spray. Even if the fact that the officers did not have the halls cleared completely may have been negligent or careless, Garza has not shown that this failure amounted to deliberate indifference as that term was defined in Farmer. *See also* Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006) (noting that deliberate indifference is "an extremely high standard to meet.")

In Adames v. Perez, 331 F.3d 508, 513 (5th Cir. 2003), the Fifth Circuit stated that even if prison officials were derelict in their duties by failing to follow standard safety procedures, this would not be sufficient to show that these officers were deliberately indifferent to the plaintiff's safety. The same situation exists in this case; even if the officers were derelict in failing to have the halls completely cleared, this does not in and of itself show that they were deliberately indifferent to his safety.

Nor does the fact that Garza unquestionably sustained serious injury show that the prison officials were deliberately indifferent. The Fifth Circuit has held that complaints by prisoners for negligence on the part of prison officials, even where serious injury occurs, do not set out a valid claim under the Civil Rights Act even if such complaints could be valid under state law. *See* Bowie v. Procunier, 808 F.2d 1142 (5th Cir.1987). Garza's allegations, whether or not they are sufficient to show negligence, are plainly insufficient to show that the prison guards acted with deliberate indifference to his safety, and his claims on this point are without merit.

Along the same lines, Garza contends that the escorting officers, Paula Guerrant and Shelby Jones, failed to take sufficient action to protect him. He says that the officers did not use their pepper spray or their riot batons, although he concedes that one of the assailants took Jones'

baton away and hit her with it. He also says that the officers did not order the inmates to stop the assault or to lay on the ground.

Garza says that the attackers "overpowered" the officers, which is consistent with the officers' own statements. At the evidentiary hearing, Garza stated that the officers tried to fight the inmates off, but indicated that they were "reluctant." These statements by Garza indicate that both Guerrant and Jones tried to protect Garza by fighting with the assailants, but both of the officers were knocked to the ground during the struggle, which Garza estimated lasted no more than 25 seconds; Jones lost her baton, either by dropping it or by having it taken from her hand by an attacker, and was hit on the leg with it. Garza has failed to show that the officers acted with deliberate indifference to his safety during the actual assault.[1]

Garza also sues the upper echelons of the prison administration, including Warden Biscoe, Warden Herrera, and Major Owens. The gravamen of his claims against these individuals is the assertion that they failed to train their subordinates and allowed individuals with inadequate training to escort him.

The Supreme Court has held that the inadequacy of training amounts to a constitutional violation only where the failure to train amounts to deliberate indifference to the rights of those persons with whom the inadequately trained officers come into contact. City of Canton, Ohio v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 1204-05 (1989) (liability of municipality for inadequate training of police officers). Further, the deprivation suffered as a result of the alleged failure to train must be a constitutional one. Collins v. City of Harker Heights, Texas, 112 S.Ct. 1061, 1069 (1992).

The Fifth Circuit has held that in a case involving failure to train or supervise, the plaintiff must show that (1) the supervisor either failed to supervise or train the subordinate official;

---

[1] Garza says that Jones was pregnant and so she "knew she could not and would not respond to any real or potential threat of harm to plaintiff to that of her unborn fetus" [sic]. He has not shown that Jones was deliberately indifferent to his safety at all, much less that her actions or inactions were motivated by her pregnancy.

(2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference. Mesa v. Prejean, 543 F.3d 264, 274 (5th Cir. 2008). The Court went on to explain that deliberate indifference meant "a conscious choice to endanger constitutional rights" and that the proof of deliberate indifference generally requires more than a single instance of the lack of training or supervision causing a violation of constitutional rights. Mesa, 543 F.3d at 274.

In addition, the Fifth Circuit has held that a claim of failure to train presupposes an underlying constitutional violation. *See* Perryman v. Bloomfield, 69 Fed.Appx. 659 (5th Cir., May 30, 2003) (unpublished) (available on WESTLAW at 2003 WL 21356054), *citing* City of Canton, 489 U.S. at 385; *accord*, Becerra v. Asher, 105 F.3d 1042, 1048 (5th Cir. 1997). In this case, however, as in Perryman and Becerra, there is no underlying constitutional violation, because Garza has failed to show that the harm which came to him was the result of deliberate indifference to his safety. In the absence of an underlying constitutional violation, Garza cannot maintain a cause of action for inadequate training or supervision.

Similarly, Garza says that because he is classified as a security risk and an escape risk, he is supposed to be escorted by a ranking officer, but that instead, he was escorted by two correctional officers without a ranking officer. Even if he is correct that TDCJ rules were thereby violated, Garza has nonetheless failed to show that the fact that a ranking officer was not assigned to escort him to the infirmary to receive his insulin shot amounted to deliberate indifference to his safety. This claim is without merit.

Garza also complains that Warden Biscoe was deliberately indifferent to his safety by operating the Beto Unit with insufficient security staff. In Hinojosa v. Johnson, 277 Fed.Appx. 370 (5th Cir., May 1, 2008) (unpublished) (available on WESTLAW at 208 WL 1924216), the Plaintiff sued, *inter alia*, TDCJ Executive Director Gary Johnson and TDCJ-CID Director Douglas Dretke, asserting that these officials had actual knowledge of understaffing in the Texas prison system and the resulting substantial risk of harm created. In affirming the dismissal of these claims,

13

the Fifth Circuit stated that the plaintiff had offered nothing to show that these defendants had affirmatively participated in any unconstitutional acts or implemented a policy of understaffing, nor that they were aware that understaffing produced a substantial risk of harm to inmate safety, nor that they had failed to take or even could take reasonable steps in an attempt to rectify the problem. Hinojosa, 277 Fed.Appx. at 378, *citing* Mouille v. City of Live Oak, 977 F.2d 924, 929 (5th Cir. 1992).

There is no dispute that the Texas prisons are understaffed. The official TDCJ website designates 16 units as being understaffed; as of February 1, 2009, four additional units, including the Beto Unit, were added to this designation. *See* http://www.tdcj.state.tx.us/vacancy/coinfo/bonus.htm#usf. However, the courts have held that evidence of understaffing, without more, is not proof of official policy. Hood v. Itawamba, 819 F.Supp. 556, 566 (N.D.Miss. 1993); Gagne v. City of Galveston, 671 F.Supp. 1130, 1135 (S.D.Tex. 1987), *aff'd* 851 F.2d 359 (5th Cir. 1988). Instead, evidence of understaffing would become proof of an official policy only if more complete funding and staffing were available and it was the deliberate intent of the policy-making official not to adequately fund and staff the prison. Gagne, 671 F.Supp. at 1135; *accord*, Doe v. Sullivan County, Tennessee, 956 F.2d 545, 550 (6th Cir. 1992) (evidence of overcrowding or shortage of jailers does not establish a plaintiff's burden in a failure to protect case); Morgan v. Cabana, civil action no. 1:07cv1121 (S.D.Miss., April 21, 2009) (unpublished) (available on WESTLAW at 2009 WL 1066294) (general allegations that defendant jail officials failed to protect the plaintiff because the jail was overcrowded and the facility was understaffed, creating conditions that made an attack by other inmates more likely, did not state a constitutional claim for deliberate indifference to the plaintiff's safety).

In this case, Garza has failed to show that the understaffing of the Texas prisons was the result of deliberate indifference to his safety or the safety of other inmates, nor that more complete funding and staffing are available and that it was the deliberate intent of responsible officials which caused the failure to adequately fund and staff the facility. The mere fact that the

facility may have been understaffed is not in and of itself proof of deliberate indifference. Garza's claim on this point is without merit.[2]

Finally, Garza says that at least one of the attackers had been previously assigned to administrative segregation, but had been released back into the general population. He says that "upon information and belief," Sgt. Luna, the gang intelligence officer, knew that this inmate was suspected of being a member or associate of a security threat group, yet failed to take "appropriate measures to investigate further" before releasing this inmate into the general population or making it known to the officials responsible for such decisions. He says that Luna acted with deliberate indifference by "leaving these suspected gang members out in the general population of the prison, knowing they were a serious threat to non-gang members and ex-gang members."

The TDCJ Offender Orientation Handbook, p. 26, (available on-line at http://www.tdcj.state.tx.us/publications/cid/publications-cid-offender-orientation-handbook.htm), provides that inmates confirmed as security threat group members will be assigned to administrative segregation. In this case, as Garza acknowledges, neither of his attackers had been confirmed as members of the Mexican Mafia at the time of the assault, although one or both of them were suspected members. The fact that these individuals, who were only suspected of being members, were not removed from general population and placed into administrative segregation does not show that the prison officials were deliberately indifferent to Garza's safety.

Under Garza's theory, all inmates for whom even a suspicion exists of gang affiliation should be placed into administrative segregation, and prison officials risk being deemed deliberately indifferent if they do not do so. This is not constitutionally required, nor even feasible. Even if the

---

[2]In addition, without relying on such information, the Court notes that the TDCJ website states that since April 1, 2008, TDCJ has been offering correctional officers a bonus of $1,500.00 to accept assignment to one of these units. TDCJ also has had a program since September of 2005 in which an employee who recruits another person to obtain employment with the prison will receive a $200 Series EE savings bond, and representatives of TDCJ participate in job fairs and hiring seminars around the state in an effort to recruit employees.

failure to place all inmates suspected of affiliation with the Mexican Mafia into segregation because these inmates could pose a potential threat to Garza amounted to negligence, a dubious proposition at best, Garza has not shown that this failure amounted to deliberate indifference to his safety; he has not shown that allowing these inmates, or any other inmates suspected of affiliation with the Mexican Mafia, to remain in general population pending confirmation of this affiliation, was an excessive risk of which the prison officials had actual knowledge and knowingly disregarded. *See* Farmer, 511 U.S. at 838 (noting that to show deliberate indifference, the plaintiff must show that the prison officials knew of an excessive risk to his safety and disregarded this risk).

As noted above, the fact that inmates who were suspected, but not confirmed, of being associated with the Mexican Mafia lived on a general population hallway through which Garza had to pass in order to get to the infirmary does not show that the prison officials were deliberately indifferent to his safety. Garza cannot plausibly argue that Sgt. Luna was deliberately indifferent to *his* safety by not placing every inmate even suspected of affiliating with the Mexican Mafia into administrative segregation; while allowing inmates with suspected gang ties to live in the prison's general population inevitably poses some risk of harm to others, Garza has not shown that this is an "excessive" risk within the meaning of Farmer, nor that the prison officials "knowingly disregarded" such a risk. Garza's claim against Sgt. Luna is without merit.[3]

### Garza's Pendent State Law Claims

In his complaint, Garza invokes the supplemental jurisdiction of the Court, raising claims of negligence and violations of the Texas Tort Claims Act. The doctrine of supplemental jurisdiction is codified in 28 U.S.C. §1367, for all civil actions filed on or after December 1, 1990.

---

[3]In his concurring opinion in Farmer, Justice Thomas aptly noted as follows: "Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another. Regrettably, 'some level of brutality and sexual aggression among prisoners is inevitable no matter what the guards do ... unless all prisoners are locked in their cells 24 hours a day and sedated.'" Farmer, 511 U.S. at 858 (Thomas, J., concurring in the judgment) (citing McGill v. Duckworth, 944 F.2d 344, 348 (7th Cir. 1991).

See Public Law 101-650, Section 310(c); Whalen v. Carter, 954 F.2d 1087, 1097 n.10 (5th Cir. 1992).

28 U.S.C. §1367(a) reads as follows:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Subsection (b) refers to actions filed under diversity jurisdiction and thus is not applicable in this case. Subsection (c) reads as follows:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if–
>
> (1) The claim raises a novel or complex issue of State law;
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;
>
> (3) the district court has dismissed all claims over which it has original jurisdiction; or
>
> (4) in exceptional circumstances, there are compelling reasons for declining jurisdiction.

Here, the Court acquired original jurisdiction based on the plaintiff's claim of a violation of federal law under 42 U.S.C. §1983 and the Eighth Amendment to the U.S. Constitution. *See* Baker v. McCollan, 443 U.S. 137 (1979). However, the plaintiff failed to show a constitutional violation. Thus, the claims over which this Court possessed original jurisdiction are without merit. This Court may therefore decline supplemental jurisdiction over the plaintiff's state law claims, deferring instead to the laws and judicial processes of the State of Texas. 28 U.S.C. §1367(c)(3). In that event, the statute of limitations on such claims would be tolled from the date the lawsuit was originally filed until thirty days after the final judgment dismissing the action is entered on the

docket. 28 U.S.C. §1367(d); *see also* Slaughter v. Allstate Insurance Co., 803 F.2d 857 (5th Cir. 1986) (supplemental jurisdiction should not ordinarily be exercised where there is no federal claim).

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 at 327, *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Garza's federal law claims lack any arguable basis in law and fail to state a claim upon which relief may be granted, because he simply has not made a showing that any of the named defendants were deliberately indifferent to his safety as that term has been defined by the Supreme Court and the Fifth Circuit. The Court does not in any sense minimize the severe injuries which Garza suffered; however, in order to prevail in his lawsuit, he must show that one or more Defendants acted with deliberate indifference to his safety, and he has not made such a showing. Consequently, his claims may be dismissed under Section 1915A. *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). Because these federal law claims lack merit, the Court should decline supplemental jurisdiction over Garza's state law claims. It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED as lacking an arguable basis in law and for failure to state a claim upon which relief may be granted. Such

dismissal shall be with prejudice as to its refiling in federal court, but without prejudice as to any relief under state tort law which Garza may seek in the courts of the State of Texas. 28 U.S.C. §1915A. It is further

ORDERED that the statute of limitations on Garza's state law claims be and hereby is TOLLED from the date that the lawsuit was originally filed until 30 days after the date of entry of final judgment in the case. 28 U.S.C. §1367(d). It is further

ORDERED that this lawsuit shall not count as a strike for purposes of 28 U.S.C. §1915(g). Finally, it is

ORDERED that any and all motions which may be pending in this cause are hereby DENIED.

**So ORDERED and SIGNED this 29th day of April, 2009.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE